Filed 3/4/21  P. v. Thomas CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARCUS VAN THOMAS,<br><br>    Defendant and Appellant. | F077756<br><br>(Super. Ct. No. VCF311890B)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Kathryn T. Montejano, Judge.

Rex Adam Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Michael Dolida, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Marcus Van Thomas (defendant) pleaded no contest to one count of attempted premeditated murder and admitted various enhancement allegations.  The question presented on appeal is whether the trial court erroneously denied a motion to withdraw

the plea.  We conclude the trial court acted within its discretion.  There are alternative claims of sentencing error, including a conceded issue regarding the calculation of defendant's presentence custody and conduct credits.  We will modify the judgment to correct the conceded error and affirm the judgment as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 14, 2015, Visalia police officers were dispatched to a gas station to investigate a shooting.  Eyewitnesses described a confrontation between two groups of Hispanic males that had ended in gun violence.  Two people sustained nonlethal injuries.  Three men, including the shooter, had fled in a red Chevrolet Avalanche.

While investigators were processing the crime scene, other officers conducted a traffic stop of two men in a red Chevrolet Avalanche.  Witnesses to the shooting were taken to the traffic stop to participate in field showups.  Defendant (then age 24) and his cousin, Juan Lopez (then age 22), were positively identified.  The witness identifications conflicted in terms of which person was the shooter.

Further investigation led to the arrest of defendant's uncle, Tomas Pizana (then age 40).  Two witnesses identified Pizana from photographic lineups, including a gas station employee who knew him as a regular customer.  Police also obtained surveillance footage of the shooting, which had been captured from multiple angles.  According to preliminary hearing testimony, the video evidence confirmed the involvement of all three suspects and established that defendant was the shooter.  Testimony by the People's gang expert suggested it was a gang-related shooting involving members of two rival groups, i.e., Norteños and Sureños.

Defendant, Lopez, and Pizana were jointly charged with attempted premeditated murder and two counts of assault with a semiautomatic firearm.  Sentencing enhancement allegations were included with each count.  Plea negotiations began as early as September 2015 and continued off and on through December 2017.

2.

At a pretrial conference held on December 14, 2017, the parties advised the trial court of a potential settlement. There was a tentative agreement for defendant to admit guilt in exchange for a prison sentence of 23 years to life. His cousin, Lopez, would plead out in exchange for a fixed term of 22 years. The plea bargain was structured as a "package deal," and negotiations concerning the uncle, Pizana, were ongoing. Accordingly, and because defendant and/or his cousin wanted more time to consider the offer, the trial court granted a one-week continuance.

On the morning of December 21, 2017, defendant's attorney told the trial court, "[W]e're just gonna confirm [the trial date]," thus indicating plea negotiations had broken down. In response, the trial court asked about defendant's maximum exposure. The prosecutor estimated "at least 40-to-life" and possibly "65-to-life per defendant."

The trial court asked if there were any questions about the prosecutor's estimate, which prompted counsel for Pizana to make a statement: "Your Honor, my client wanted to accept the offer that was extended to him today. He has significant medical—there's a significant medical situation that is going to make it very problematic for him to survive the trial. So he wanted to enter a plea today so that he can get on his way to the Department of Corrections where he can get on a list for a kidney transplant, but that was contingent upon the two codefendants accepting their offers. I can't speak for them." Counsel also said Pizana was receiving dialysis three times a week, which counsel believed might affect the trial proceedings.

The other defense attorneys did not comment upon the remarks about Pizana. A trial date was confirmed, and the hearing concluded with the prosecutor rescinding all offers. Later that afternoon, the parties reconvened and informed the trial court that a deal had been reached. Defendant's attorney had reportedly sought to reopen negotiations following the morning session, which ultimately led to a resolution.

The terms of the agreement were as indicated the previous week, at least with respect to defendant and Lopez. Defendant was to receive a stipulated sentence of 23

3.

years to life in exchange for a plea of no contest to attempted premeditated murder (Pen. Code, §§ 187, 664; all undesignated statutory references are to this code). The substantive offense accounted for the life term, i.e., life with a minimum parole ineligibility period of seven years. (See §§ 664, subd. (a), 3046, subd. (a)(1).) The additional 16 years would be based on admissions of personal use of a firearm (§ 12022.53, subd. (b)), personal infliction of great bodily injury (§ 12022.7, subd. (a)), and a gang enhancement (§ 186.22, subd. (b)(1)(A)). The remaining charges would be dismissed. Lopez and Pizana would be sentenced to fixed terms of 22 years and 11 years, respectively.[1]

An unusual colloquy between defendant and the trial court preceded defendant's formal change of plea. Both sides rely on defendant's statements to support their positions on appeal. In lieu of summarizing the lengthy exchange, we provide these excerpts from the record:

> "[DEFENSE COUNSEL]: Your Honor, before you take his plea, he wanted to address the court. I'm advising it's probably not a good idea, but he wants to address the court.
>
> "THE COURT: Okay.
>
> "[DEFENDANT]: Hi, your Honor. I'm Marcus Thomas, and I been housed for three years. I currently want to bring to light a couple of my concerns. [¶] All I have is my family, and they're trying to give me life and trying to deprive me for liberty. I'll be sentenced to life, a life sentence. All I have is my family out there. That's all I have right there, and I talked to my lawyer, and I told him if by any chance would it be possible I could get a deal without a life sentence 'cause I'm trying to be able to come home and be with my family. That's all I got is my family, and I'm making good

---

[1]Lopez pleaded no contest to attempted murder without premeditation, punishable by the upper term of nine years (§ 664, subd. (a)), and he admitted allegations supporting a three-year great bodily injury enhancement (§ 12022.7, subd. (a)) and a 10-year gang enhancement (§ 186.22, subd. (b)(1)(C)). The remaining charges against Lopez in this case were dismissed, but he received additional punishment for separately pending matters. Pizana pleaded no contest to one count of assault with a semiautomatic firearm (§ 245, subd. (b)), stipulating to the middle term of six years, and a consecutive five-year gang enhancement (§ 186.22, subd. (b)(1)(B)). All other charges against Pizana were dismissed.

choices, and—and I'm here to—for better opportunities for my family, and I wouldn't want to accept a life deal, and I think they're depriving me for liberty, and I would never be able to see—I would never be able to see freedom again with this life deal, and on my behalf, I'm asking the Court of Law if by any chance I could be able to get a deal without the life sentence.

"I have no history, no prior history whatsoever. How I see it is I'm a working man. I'm a working man, I shouldn't be deprived for liberty. They're taking—what they're taking from me is a part of my life right there, and I feel I shouldn't be held accountable to be life.

"[DEFENSE COUNSEL]: And, your Honor, I might for the record, I've explained to my client—I've explained to my client that the power is not in the court's hands right now to make that offer to the defendant.

"THE COURT: Right.

"[DEFENSE COUNSEL]: And the offer at the preliminary hearing—before the preliminary hearing was somewhere in the neighborhood of 40 years, 39, 40 years without a life sentence, and I've asked the District Attorney's Office if they would be willing to renew that pre-preliminary hearing offer, and they've declined.

"So I've explained to my client that what's on the table right now is the 23-years-to-life offer, and the only way that he's going to be able—well, put it this way: The DA's office is holding that offer open, and there's really nobody else that can take life off the table unless we go to trial and we're successful in beating all of the charges that have a life—potential life sentence.

"And I think that maybe it was unclear, that [defendant] maybe thought maybe at some point in time you have the power now to take life off the table. I think that's what his concern is, that somehow now, you have that opportunity to do that for him.

"THE COURT: Okay. Thank you for clarifying that for me. [¶] [Defendant], I don't have that power. Our government works in such a way that the charging agency is the District Attorney's Office. I am the judge, and I don't make any decisions, nor can I make any decisions. I certainly don't—I just simply do not have the jurisdiction to make any decisions about how you're charged.

"[DEFENDANT]: I see a life sentence is cruel and unusual punishment—

"THE COURT: Okay.

5.

"[DEFENDANT]: —'cause I have a family out there. They shouldn't deprive me for life, that's how I see it.

"THE COURT: I've heard you. I understand your thoughts.

"[DEFENDANT]: Yeah.

"THE COURT: Would you like to go forward with this? I know you don't want to, but are you going to go forward with this?

"[DEFENDANT]: However, if I take the deal, I want to know how much—what's my percentage gonna be; am I gonna qualify for YOP or—"

Defense counsel interjected to explain he had advised defendant that he would need to serve at least 85 percent of the 23-year parole ineligibility period, but his status as a young offender might make him eligible for an earlier parole hearing.[2] After a brief discussion of parole procedures, defendant's conversation with the trial court resumed as follows:

"[DEFENDANT]: Yeah. Your Honor, I was told—I'm not sure how this is really working, but if I can get a deal, and he might be able to take the deal. It's a reasonable deal 'cause I have no strikes, I have no history, and I'm willing to give a deal like—I know they were talking about 39 [years] without the life. I'll take 30 with two strikes—

"THE COURT: Sir, let me explain something to you right now. I'm not negotiating.

"[DEFENDANT]: Yeah, but—

"THE COURT: No, listen to me. I'm not negotiating with you.

"[DEFENDANT]: Yeah.

"THE COURT: I brought everybody back today 'cause I understood that you were ready—

"[DEFENDANT]: Yeah.

"THE COURT: —to take responsibility.

---

[2]Under the current version of section 3051, defendant will be eligible for parole on "the first day of [his] 20th year of incarceration." (*Id.*, subd. (b)(2).)

6.

"[DEFENDANT]:  Yeah.

"THE COURT:  So either you [are] or you aren't.

"[DEFENDANT]:  Would we be able to throw out deals, though?

"THE COURT:  Pardon?

"[DEFENDANT]:  Can we throw out a deal?

"[DEFENSE COUNSEL]:  For the record, I've taken that offer, 30 years, the two strikes, to [the prosecutor].

"THE COURT:  I heard that twice, and he said no.

"[DEFENSE COUNSEL]:  And he said no.

"THE COURT:  That to me is very clear.

"(Whereupon, the defendant was conferring with his attorney off the record.)

"THE COURT:  So are we ready to go forward?

"[DEFENDANT]:  Yeah."

The trial court advised defendant of the rights he was waiving by changing his plea and reviewed the terms of the plea agreement.  At one point, defendant was asked, "Other than what I've told you regarding the consequences of your plea, has anybody threatened you or promised you anything to get you to enter into this plea?"  He answered "No."  Defendant went on to plead no contest according to the terms summarized above.

Defendant was represented by private counsel throughout the plea bargaining process and at the change of plea hearing.  In February 2018, two months after the plea of no contest was entered, the defense attorney substituted out of the case and the Christopher R. Martens Law Corporation became defendant's counsel of record.  In April 2018, defendant filed a motion to withdraw his plea.  In a supporting declaration, defendant claimed to have been pressured into the plea agreement by the threat of his uncle dying in custody if the case went to trial.  Allegedly, "The threats advanced about

7.

the grave consequences facing [Pizana], combined with the promises of leniency toward [Pizana], briefly overcame [defendant's] exercise of free judgment."

The People opposed the motion, alleging it was *defendant's attorney* who had proposed the sentence of 23 years to life in an offer made on or about December 7, 2017. In response, the People had "proposed to accept the offer if it were packaged with the other defendants." Accordingly, at the pretrial conference on December 14, 2017, the prosecutor informed the trial court (1) they were working on a "package deal," (2) the terms of Pizana's plea bargain were still being negotiated, and (3) "the defendants … asked for slightly more time to consider" the terms. The People further argued Pizana's health problems had been a "longstanding" issue and were known to everyone prior to defendant's change of plea.

On May 25, 2018, defendant's motion was heard and denied. On July 26, 2018, defendant was sentenced pursuant to the plea agreement. The trial court ordered defendant to pay fines, assessments, and victim restitution, which is further discussed in the body of this opinion. In August 2018, defendant obtained a certificate of probable cause and filed a timely notice of appeal.

## DISCUSSION

### I.      Motion to Withdraw Plea

"When a criminal defendant enters a guilty plea, the trial court is required to ensure that the plea is knowing and voluntary." (*People v. Cross* (2015) 61 Cal.4th 164, 170.) The defendant "must understand the nature of the charges, elements of offenses, pleas and defenses which may be available and punishment which may be expected before a trial judge accepts his waiver and plea." (*People v. Hunt* (1985) 174 Cal.App.3d 95, 103.) When those requirements are met, "pleas resulting from a bargain should not be set aside lightly and finality of proceedings should be encouraged." (*Ibid*.)

The withdrawal of a guilty or no contest plea requires a showing of good cause, which must be demonstrated by clear and convincing evidence. (§ 1018; *People v. Cruz*

8.

(1974) 12 Cal.3d 562, 566; *People v. Waters* (1975) 52 Cal.App.3d 323, 328.) "'Good cause' means mistake, ignorance, fraud, duress or any other factor that overcomes the exercise of free judgment." (*People v. Ravaux* (2006) 142 Cal.App.4th 914, 917.) "The fact that [defendant] may have been persuaded, or was reluctant, to accept the plea is not sufficient to warrant the plea being withdrawn." (*Id*. at p. 919.)

"When a defendant is represented by counsel, the grant or denial of an application to withdraw a plea is purely within the discretion of the trial court after consideration of all factors necessary to bring about a just result." (*People v. Shaw* (1998) 64 Cal.App.4th 492, 495–496.) The defendant's "[p]ostplea apprehension regarding the anticipated sentence, even if it occurs well before sentencing, is not sufficient to compel the exercise of judicial discretion to permit withdrawal of the plea." (*People v. Hunt*, *supra*, 174 Cal.App.3d at p. 104.) On appeal, the trial court's ruling "will be upheld unless there is a clear showing of abuse of discretion." (*Shaw*, at p. 496; accord, *People v. Fairbank* (1997) 16 Cal.4th 1223, 1254.) "Moreover, a reviewing court must adopt the trial court's factual findings if substantial evidence supports them." (*Ibid.*)

A trial court must apply extra scrutiny to a "so-called 'package-deal' plea bargain in which the prosecutor offers a defendant the opportunity to plead guilty to a lesser charge, and receive a lesser sentence, contingent upon a guilty plea by *all* codefendants." (*In re Ibarra* (1983) 34 Cal.3d 277, 286–287 (*Ibarra*).) In *Ibarra*, the California Supreme Court held such agreements are "not intrinsically coercive, but may be so under the individual circumstances." (*Id*. at p. 283.) The opinion identifies four factors to be considered when examining "the totality of the circumstances." (*Id*. at pp. 288–290.)

"First, the court must determine whether the inducement for the plea is proper. The court should be satisfied that the prosecution has not misrepresented facts to the defendant, and that the substance of the inducement is within the proper scope of the prosecutor's business." (*Ibarra*, *supra*, 34 Cal.3d at pp. 288–289.) If the People are

leveraging their ability to prosecute third parties, they must have "a reasonable and good faith case against the third parties to whom leniency is promised." (*Id*. at p. 289.)

The trial court discussed the *Ibarra* factors at length during the motion hearing. It had this to say about the first factor: "I've never heard anything in this case, and this case has been discussed in depth in detail repeatedly, that there was any problem here with somebody being roped into this, if you will, based on whether or not there was not a good case—a case against—a good case against the defendant." The record supports the trial court's statement as well as all implied findings regarding the case against defendant's uncle.

According to the preliminary hearing evidence, defendant and his cousin were sitting in Pizana's truck when Pizana got into an argument with two men inside the gas station. Pizana exited the establishment and signaled to his nephews by clapping his hands and making a gun-like gesture ("he stuck his middle and index finger out with his ring and pinky finger in, thumb up and he kind of motioned it kind of upward"). Pizana walked out to the truck, met up with defendant and Lopez, and the three of them began moving back toward the building. Next, defendant fired gunshots at the men with whom Pizana had been arguing.

The second *Ibarra* factor is the factual basis for the plea. "If the guilty plea is not supported by the evidence, it is less likely that the plea was the product of the accused's free will. The same would be true if the 'bargained-for' sentence were disproportionate to the accused's culpability." (*Ibarra*, *supra*, 34 Cal.3d at p. 289.) This factor weighs in favor of the trial court's ruling. By stipulation of the parties, the preliminary hearing evidence provided the factual basis for the pleas.

"Third, the nature and degree of coerciveness should be carefully examined. Psychological pressures sufficient to indicate an involuntary plea might be present if the third party promised leniency is a close friend or family member whom the defendant feels compelled to help." (*Ibarra*, *supra*, 34 Cal.3d at p. 289.) If those circumstances

10.

exist, the fourth factor is considered, i.e., the degree to which concern for the friend or relative motivated the defendant to accept the plea offer. "[A] plea is not coerced if the promise of leniency to a third party was an insignificant consideration by a defendant in his choice to plead guilty. For example, if the motivating factor to plead guilty was the realization of the likelihood of conviction at trial, the defendant cannot be said to have been 'forced' into pleading guilty, unless the coercive factors present had nevertheless remained a *substantial factor* in his decision. [Citations]." (*Id*. at pp. 289–290.)

The trial court found the third and fourth *Ibarra* factors were "relevant to this case," but it noted defendant had focused on the length of his sentence when expressing reservations about the plea deal. The trial court observed, "[Defendant] spoke a lot that day, much more than I see in courtrooms, okay, and what [he] kept speaking about that day was whether or not it was going to be a life sentence, was whether or not he felt as though the sentence was fair to him based on time, not based on innocence or guilt, but based on time."

Later, after the prosecutor had cited the "*substantial factor*" language in *Ibarra*, *supra*, 34 Cal.3d at page 290, the trial court impliedly found defendant's concern for Pizana's health was not a significant consideration in his acceptance of the plea bargain. Addressing defense counsel, the trial court stated, "I understand your point about the cousin's—or the uncle, excuse me, medical condition. [But e]verything that [was] spoken about [at the change of plea hearing] [was] about the amount of time, and it just—as I read this transcript, there's nothing about it that—that sounds or hints at coercion."

The transcript of the change of plea hearing on December 21, 2017, supports all findings concerning the third and fourth *Ibarra* factors. The record also shows that Pizana's medical issues were known and documented long before the parties began negotiating a "package deal." A letter from Pizana's mother, filed with the court in March 2015, alleged he suffered from "major problems due to di[a]betes" and high blood

pressure, had been diagnosed with "early stages of heart fail[ure]" and kidney disease, and might soon require dialysis.

In his briefing, defendant repeatedly cites to this statement in *People v. Ramirez* (2006) 141 Cal.App.4th 1501, 1507 (*Ramirez*): "'"[I]t has been held that the least surprise or influence causing a defendant to plead guilty when he has any defense at all should be sufficient cause to permit a change of plea from guilty to not guilty."'" The reliance upon *Ramirez* is misplaced.

First, *Ramirez* is factually inapposite. The *Ramirez* case involved "clear and convincing evidence that the prosecution's withholding of favorable evidence affected [the appellant's] judgment in entering his plea, rendering the waiver of rights involuntary." (*Ramirez*, *supra*, 141 Cal.App.4th at pp. 1507–1508.) Consequently, the trial court was deemed to have abused its discretion by denying the appellant's motion to withdraw the plea. (*Id*. at p. 1507.)

Second, the quote regarding "'"the least surprise or influence causing a defendant to plead guilty"'" comes from *People v. McGarvy* (1943) 61 Cal.App.2d 557. (*Ramirez*, *supra*, 141 Cal.App.4th at p. 1507.) The *McGarvy* court, in saying "it has been held that the least surprise or influence …," was referencing a case decided 127 years ago by the Supreme Court of Louisiana. (*McGarvy*, at p. 564, citing *State v. Williams* (1893) 45 La.Ann. 1356, 1357.) Insofar as the subject language in *Ramirez* and *McGarvy* is a correct statement of California law, it is qualified by the holdings of the California Supreme Court. The *Ibarra* opinion plainly states, "[A] plea is not coerced if the promise of leniency to a third party was an insignificant consideration by a defendant in his choice to plead guilty." (*Ibarra*, *supra*, 34 Cal.3d at pp. 289–290.) Furthermore, good cause to withdraw a plea must be established by "clear and convincing evidence." (*People v. Wharton* (1991) 53 Cal.3d 522, 585; accord, *People v. Cruz*, *supra*, 12 Cal.3d at p. 566.)

A more relevant case is *People v. Huricks* (1995) 32 Cal.App.4th 1201. In *Huricks*, there was "no evidence to support [the appellant's] contention that at the time he

12.

entered his plea of nolo contendere, he was subjected to 'overbearing duress,' other than his statement at the hearing on the motion to withdraw his plea that he was 'asked by [his] family to take this plea bargain' and, according to his counsel, was 'confused and indecisive' as to whether to follow their advice." (*Id*. at p. 1208.) The appellate court ruled the "claim that his family pressured him into the plea [was] not enough to constitute duress. Nothing in the record indicate[d] he was under any more or less pressure than every other defendant faced with serious felony charges and the offer of a plea bargain." (*Ibid*.)

Here, defendant's belated allegations of familial pressure were not corroborated by the attorney who represented him during the plea negotiations or by any other person with knowledge of those events. Defendant's motion was based solely upon his own declaration and the circumstance of his uncle's medical condition. "However, in determining the facts, the trial court is not bound by uncontradicted statements of the defendant." (*People v. Hunt*, *supra*, 174 Cal.App.3d at p. 103; see *People v. Ravaux*, *supra*, 142 Cal.App.4th at p. 918 [trial court may "take into account the defendant's credibility and his interest in the outcome of the proceedings"].)

There is no question defendant hesitated to accept the plea deal, but "his continued reluctance and vacillation between desiring to plead and considering going to trial" is not, per se, clear and convincing evidence of good cause to withdraw his plea. (*People v. Hunt*, *supra*, 174 Cal.App.3d at p. 104; accord, *People v. Huricks*, *supra*, 32 Cal.App.4th at pp. 1208–1212.) Based on the entire record, we conclude it was within the trial court's discretion to deny defendant's motion for lack of good cause. Defendant thus fails to satisfy his burden on appeal. (See *People v. Shaw*, *supra*, 64 Cal.App.4th at p. 496 ["An abuse of discretion is found if the court exercises discretion in an arbitrary, capricious or patently absurd manner resulting in a manifest miscarriage of justice"].)

## II. *Dueñas* Claim

Defendant alleges the trial court erred by imposing certain financial obligations as part of his sentence. His claim concerns a $10,000 restitution fine (see § 1202.4, subd. (b)(1)), a $40 court operations assessment (§ 1465.8, subd. (a)(1)), and a $30 criminal conviction/court facilities assessment (Gov. Code, § 70373, subd. (a)(1)). Defendant made no objections to the fine or the assessments at the time of sentencing.

Defendant relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which holds "that due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under … section 1465.8 and Government Code section 70373." (*Id*. at p. 1164.) The *Dueñas* opinion further holds that "although … section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Ibid*.)

The California Supreme Court will soon decide whether trial courts must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments; and if so, which party bears the burden of proof. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, 94–98, review granted Nov. 13, 2019, S257844.) However, this district has held that a defendant forfeits an "ability to pay challenge" by failing to object at the time of sentencing. (E.g., *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1053–1054; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1073–1075 (*Aviles*); contra, *People v. Son* (2020) 49 Cal.App.5th 565, 596–598.) Like the appellants in *Lowery* and *Aviles*, defendant had a clearly established right to object to a restitution fine in excess of the $300 statutory minimum (see § 1202.4, subds. (b)–(d)), but he accepted the fine and the assessments without comment. (*Lowery*, *supra*, at pp. 1053–1054; *Aviles*, *supra*, at pp. 1061–1062.)

14.

Defendant argues his claim is not forfeited because it presents a purely legal issue and/or because *Dueñas* "represents an 'unforeseen change in the law.'" The same arguments were rejected in *People v. Frandsen* (2019) 33 Cal.App.5th 1126. (*Id*. at pp. 1153–1155.) This district has followed *Frandsen* in cases such as *Aviles*, and we will do so again here. (See *Aviles*, *supra*, 39 Cal.App.5th at pp. 1066–1067, 1073.)

## III.    Restitution Claim

Defendant separately challenges an order to pay direct victim restitution. He and his codefendants were held jointly and severally liable for $2,100 in moving expenses allegedly incurred by one of the victims (see § 1202.4, subd. (f)(3)(I)). Defendant argues "no substantial evidence indicates [the victim] incurred moving expenses as a result of [defendant's] criminal conduct and that relocating was necessary for [the victim's] safety or emotional well-being."

The People argue defendant forfeited this claim by not objecting at the time of sentencing. The People also dispute the claim on the merits. We agree with the forfeiture argument and do not reach the question of error.

The cases of *People v. Welch* (1993) 5 Cal.4th 228 and *People v. Scott* (1994) 9 Cal.4th 331 "brought the forfeiture rule for alleged sentencing errors into line with other claims of trial court error, rather than placing such claims outside the general rules regarding forfeiture: unless a party makes a contemporaneous objection, he or she generally cannot challenge a court's ruling for the first time on appeal." (*People v. McCullough* (2013) 56 Cal.4th 589, 594.) "*Scott* and *Welch* also distinguished between an alleged factual error that had necessarily not been addressed below or developed in the record because the defendant failed to object, and a claimed legal error, which 'can be resolved without reference to the particular sentencing record developed in the trial court.'" (*Ibid.*) "The appropriate amount of restitution is precisely the sort of factual determination that can and should be brought to the trial court's attention if the defendant believes the award is excessive." (*People v. Garcia* (2010) 185 Cal.App.4th 1203, 1218.)

15.

Therefore, claims regarding "the amount of restitution may be forfeited if not raised in the trial court." (*Ibid.*)

Defendant cites *People v. Butler* (2003) 31 Cal.4th 1119 for the proposition that "[c]laims of insufficiency of the evidence may be raised for the first time on appeal." The holding of *Butler* is not so broad, and its limited application has been noted in other California Supreme Court decisions.

> "*Butler* permitted [appellate review], even without a contemporaneous objection, of an order for involuntary HIV testing of a defendant convicted of a sex offense enumerated in section 1202.1, on the ground the record contained insufficient evidence to establish probable cause to believe the defendant transferred a bodily fluid capable of transmitting HIV to the victim. [Citation]. *Butler* did not articulate a general rule that would displace *Scott*'s forfeiture principle, and its reasoning is, on its face, limited to section 1202.1 and controlled by the statutory restrictions on involuntary HIV testing." (*People v. Aguilar* (2015) 60 Cal.4th 862, 867; see *People v. McCullough*, *supra*, 56 Cal.4th at pp. 595–597 [distinguishing *Butler* and stating *Butler* "does not endorse review in the absence of an objection below merely because an 'objective legal standard' may be at issue"].)

## IV. Miscalculated Time Credits

Defendant alleges the trial court miscalculated his presentence custody and conduct credits. He claims entitlement to an additional 29 days of custody credit and four days of conduct credit. The People appropriately concede this issue.

A defendant is entitled to credit against his or her sentence for all days spent in custody while awaiting trial and sentencing, up to and including the date when his or her sentence is imposed. (§ 2900.5, subd. (a); *People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48.) Section 4019 provides for additional presentence credits based on worktime and good behavior, collectively referred to as "conduct credit," and specifies the rate at which such credit can be earned. (§ 4019, subds. (a)–(c); *People v. Dieck* (2009) 46 Cal.4th 934, 939, fn. 3.) Section 2933.1 limits the availability of conduct credit to 15 percent of the actual period of confinement if the defendant is convicted of a violent felony, e.g., attempted murder. (§§ 2933.1, subds. (a), (c); 667.5, subd. (c)(12).)

Defendant was arrested on January 14, 2015, and sentenced on July 26, 2018. The interim period, including the date of sentencing, was 1,290 days. The available conduct credit, calculated at 15 percent of the time in custody awaiting trial and sentencing, was 193 days.

Defendant was awarded only 1,261 days of custody credit and 189 days of conduct credit. The trial court evidently relied on the probation report, wherein defendant's time credits were calculated based on the anticipated sentencing date of June 27, 2018. The June hearing was held as scheduled, but sentencing was deferred until July 26, 2018. The 29-day continuance explains the discrepancy between the actual and awarded time credits. The judgment shall be modified to reflect defendant's entitlement to an additional 29 days of presentence custody credit and four more days of presentence conduct credit.

## DISPOSITION

The judgment is modified to reflect defendant's entitlement to 1,290 days of presentence custody credit and 193 days of presentence conduct credit. As modified, and in all other respects, the judgment is affirmed. The superior court is directed to prepare an amended abstract of judgment reflecting the modification and to forward a copy to the Department of Corrections and Rehabilitation.


PEÑA, J.

WE CONCUR:


POOCHIGIAN, Acting P.J.


DE SANTOS, J.

17.